This Opinion is a
Precedent of the TTAB

Mailed: January 3, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

―――

Trademark Trial and Appeal Board

―――

*In re Solid State Design Inc.*

―――

Serial No. 87269041

―――

Gene Bolmarcich, Law Offices of Gene Bolmarcich, for Solid State Design Inc.

Erin R. Zaskoda, Trademark Examining Attorney, Law Office 103,
    Michael Hamilton, Managing Attorney.[1]

―――

Before Zervas, Lykos, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Solid State Design Inc. ("Applicant") seeks registration on the Principal Register of the mark shown below

for "Computer application software for mobile phones and desktop computers, namely, software for visualizing the popularity of places in real time, that uses an

―――

[1] Mr. Hamilton was the Managing Attorney of Law Office 103 when the Patent and Trademark Office's brief was filed. He has since retired from federal service.

underlying map capability for navigation, sold as 'business to consumer' (B2C) software, and not as 'business to business' (B2B) software," in International Class 9.[2] The Trademark Examining Attorney has refused registration of the mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that it so resembles the mark shown in Registration No. 4794959 and reproduced below



for "Downloadable mobile applications for mobile phones and mobile electronic devices, primarily software for travel and destination marketing organizations and travel marketing professionals," in International Class 9,[3] as to be likely, when used on or in connection with Applicant's goods, to cause confusion, mistake, or deception.

---

[2] Application Serial No. 87269041 was filed on December 14, 2016 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051 (a), on the basis of Applicant's claimed first use of the mark and first use in commerce on November 1, 2016. The original identification of goods was "Computer application software for mobile and desktop devices, namely, software for visualizing popular places that uses an underlying map capability for navigation." Applicant amended the identification to add, *inter alia*, the phrase "sold as 'business to consumer' (B2C) software, and not as 'business to business' (B2B) software" in response to the first Office Action citing the registration that is the subject of the final refusal to register. March 23, 2017 Response to Office Action. The application describes the mark as consisting "of the wording 'populace' with the silhouette of a person's head centered within [the] letter 'o.'"

[3] The cited registration issued on August 18, 2015. The registrant describes the mark as consisting "of an orb or ball shaped object formed by alternating bands of the colors red and white; said object casts a slight discrete shadow in grey; below the object is the word

When the Examining Attorney made the refusal final, Applicant appealed. Applicant and the Examining Attorney have filed briefs. We affirm the refusal to register. As explained below, we are compelled to do so in large part not just because the marks are similar, but because the goods and classes of customers are too: the cited registration is unrestricted in that it neither specifies the function of the registrant's downloadable mobile applications nor meaningfully limits their classes of customers.

We are obligated to decide this appeal on the basis of the registration that was issued. Applicant's argument that it "should not have registered this way under USPTO rules for specificity in software IDs," 4 TTABVUE 12, is a collateral attack on the registration, which we cannot entertain on this appeal because of the statutory presumptions that we must accord the registration under Section 7(b) of the Trademark Act. *In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1534-35 (Fed. Cir. 1997).[4] We note, however, that an applicant has the option of "seeking a consent from the owner of the cited registration, or seeking a restriction of the registration under Section 18 of the Trademark Act, 15 U.S.C. § 1068," which permits the Board in an inter partes proceeding "to cancel registrations in whole or in part, or to 'otherwise restrict or rectify . . . the registration of a registered mark.'" *In re Cook Med. Tech. LLC*, 105 USPQ2d 1377, 1384 (TTAB 2012).

---

'populace', said word being printed in small letters, all in black." The colors red, white, grey, and black are claimed as a feature of the mark.

[4] "[T]he present *ex parte* proceeding is not the proper forum for such a challenge," *id*. at 1534, which would properly be made in an inter partes proceeding for cancellation of the registration.

**Likelihood of Confusion Analysis**

Section 2(d) of the Trademark Act prohibits the registration of a mark that so resembles a registered mark as to be likely, when used on or in connection with the goods or services of the applicant, to cause confusion, mistake, or deception. 15 U.S.C. § 1052(d). Our determination of likelihood of confusion under Section 2(d) is based upon an analysis of all probative facts in the record that are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). We consider each *du Pont* factor that is relevant and for which there is record evidence. *See, e.g., M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006); *ProMark Brands Inc. v. GFA Brands, Inc.*, 114 USPQ2d 1232, 1242 (TTAB 2015). "The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976).

## I.   Similarity of the Marks

This *du Pont* factor focuses on "'the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.'" *Palm Bay Imps. Inc. v. Veuve Cliquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). "The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between

the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (quotation omitted). Applicant claims that its application software is sold "to the general consuming public," 4 TTABVUE 6, "who normally retains a general rather than a specific impression of trademarks or service marks." *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1960 (TTAB 2016); *accord Johann Maria Farina Gegenuber Dem Julichs-Platz v. Chesebrough-Pond, Inc.*, 470 F.2d 1385, 176 USPQ 199, 200 (CCPA 1972) ("[t]he focus must be on the 'general recollection'" consumers have of the two marks) (citation omitted); *see also Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) (consumers viewing a trademark "ordinarily must depend upon their past recollection of marks to which they were previously exposed") (citation omitted).

"[L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark. On the other hand, in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

Both marks contain the word "populace" in bolded all-lowercase letters, and a design element. "In the case of a composite mark containing both words and a design, 'the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed.'" *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (quoting *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir.

1983)). "The verbal portion of a word and design mark likely will be the dominant portion" because it "likely will appear alone when used in text and will be spoken when requested by consumers." *Id.* at 1911; *see also L.C. Licensing, Inc. v. Berman*, 86 USPQ2d 1883, 1887 (TTAB 2007) ("[I]t is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods.").

This general principle applies squarely to the marks here. As an initial matter, the design element in Applicant's mark is somewhat difficult to discern, as illustrated by the drawing of the mark in the application that is reproduced below:

# populace

But even if the design element is clearly recognized as "a silhouette of a person's head centered within [the] letter 'o'" in the word "populace," as Applicant describes it in the application, we find that it is a minor feature of secondary importance, and the mark will be spoken simply as the word "populace" and will be recalled primarily by that word. *See Bond v. Taylor*, 119 USPQ2d 1049, 1055-56 (TTAB 2016) (words BLACK MEN ROCK in composite mark found to be more likely to indicate the origin of the goods and services than the adjacent "silhouette of a man with his arms outstretched in a sign of victory[.]").

In the mark in the cited registration, the "orb or ball shaped object formed by alternating bands of the colors red and white" is visually striking, but this globe image has only modest source-identifying significance when it appears with the word

"populace," which means "the people who live in a country or area." MERRIAM-WEBSTER DICTIONARY (merriam-webster.com, accessed on December 6, 2017).[5] Like Applicant's mark, the cited mark as spoken is the word "populace," and we find that consumers will recall the mark primarily by that word.[6]

Thus, the word "populace" dominates both marks because it is the part that is most likely to "make an impression upon purchasers that would be remembered and relied upon to identify the goods . . . ." *In re Appetito Provisions Co.*, 3 USPQ2d 1553, 1554 (TTAB 1987).

We turn next to a comparison of the marks in their entireties, giving greater weight in that comparison to the dominant word "populace" than to the marks' design elements.

The marks are identical in sound because they are both verbalized as "populace." They are similar in appearance because although they include different design elements, the most memorable visual feature is the word "populace," which is displayed in both marks in bolded all-lowercase letters that are substantially similar in stylization. *See In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) (composite marks containing the identical words RIGHT-A-WAY were

---

[5] The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed form or regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377-78 (TTAB 2006).

[6] By way of example, while the registrant's entire mark appears on a webpage made of record by Applicant, the word "Populace" alone is used in two instances on that page to identify the registrant. March 23, 2017 Response to Office Action at 4. The word "populace" will also necessarily be used without the design features of either mark in any database searches regarding Applicant's or the registrant's application software.

dominated by those words, and differences in scripts and arrow designs in those marks did "not diminish their substantial identity when viewed as a whole.").

With respect to connotation and commercial impression, Applicant argues that "the marks have different connotations and commercial impressions" because "Applicant's mark has an outline of a person, emphasizing the social aspect of the goods, whereas the Cited Mark uses a globe design, emphasizing the travel and tourism aspect of the goods." 4 TTABVUE 19. These claimed subtle differences in meaning are not supported by any record evidence that the average consumer of application software, "who normally retains a general rather than a specific impression of trademarks," *Bay State Brewing*, 117 USPQ2d at 1960, will interpret the dominant word "populace" to connote something different in each mark. The word "populace" imbues both marks with an essentially identical meaning pertaining to "the people who live in a country or area," and we agree with the Examining Attorney that "the average consumer is most likely to recall generally the literal element 'POPULACE' . . . rather than making a very nuanced distinction that the outline of a person emphasizes the social aspect of the applicant's goods and the arguably globe or orb image emphasizes the travel and tourism aspect of the cited goods . . . ." 6 TTABVUE 7.[7]

---

[7] We further note that a globe image could actually connote the earth's "populace," an inference that Applicant fails to address.

We find that the marks are similar in appearance, identical in sound, and highly similar in connotation and commercial impression when considered in their entireties and that this *du Pont* factor strongly supports a finding of a likelihood of confusion.

## II.  Similarity of the Goods, Channels of Trade, and Classes of Customers

The second *du Pont* factor concerns the "similarity or dissimilarity and nature of the goods or services as described in an application or registration . . . ." *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1159 (Fed. Cir. 2014). The third and fourth *du Pont* factors concern "[t]he similarity or dissimilarity of established, likely-to-continue trade channels," and the "conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing," respectively. *Id*. The analysis of each of these factors is premised upon the identifications of goods in the application and in the cited registration. *Id*. at 1161-63; *Octocom Sys., Inc. v. Houston Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006) (discussing the impact of the identifications of goods on these factors).

### A.  Similarity of the Goods

The goods identified in the application are "[c]omputer application software for mobile phones and desktop computers, namely, software for visualizing the popularity of places in real time, that uses an underlying map capability for navigation, sold as 'business to consumer' (B2C) software, and not as 'business to business' (B2B) software." The word "namely" in the identification serves to specify

the function of Applicant's software as "visualizing the popularity of places in real time, that uses an underlying map capability for navigation."[8]

The goods identified in the cited registration are "[d]ownloadable mobile applications for mobile phones and mobile electronic devices, primarily software for travel and destination marketing organizations and travel marketing professionals." The function of the applications is not specified,[9] and Applicant and the Examining Attorney disagree as to the nature and scope of the goods. Applicant argues that "one can logically assume that the software must be of a type that is specifically and especially useful to travel and destination marketing organizations and travel professionals," 4 TTABVUE 12, while the Examining Attorney argues that "because the cited software identification is broad, the presumption is that such software could encompass the exact same software" identified in the application. 6 TTABVUE 10. We are constrained to agree with the Examining Attorney.

Applicant's claim that the identification in the cited registration is limited to software applications that are "specifically and especially useful" to their users must be rejected in view of the controlling principle that where the goods in an application

---

[8] The Trademark Manual of Examining Procedure ("TMEP") (Oct. 2017) states that the "terms 'namely,' 'consisting of,' 'particularly,' and 'in particular' are definite and are preferred to set forth an identification that requires greater particularity." TMEP Section 1402.03(a). We discuss below the significance of the remaining language in the identification, "sold as 'business to consumer' (B2C) software, and not as 'business to business' (B2B) software," which is a purported limitation on the classes of customers for the app, not a specification of its function.

[9] As we explain below, the word "primarily" in the registrant's identification is not the equivalent of the word "namely" in Applicant's identification, and does not serve to specify the function of the application.

or registration are broadly described, they are deemed to encompass "all the goods of the nature and type described therein . . . ." *Jump Designs*, 80 USPQ2d at 1374. The only limitation on the function of the goods in the registration is that the apps are used "for mobile phones and mobile electronic devices."[10] The identification leaves the goods broadly described as "[d]ownloadable mobile applications for mobile phones and mobile electronic devices," and we must deem those goods to include all "goods of the nature and type described therein," *id.*, which encompass Applicant's more specifically identified type of "[c]omputer application software for mobile phones."[11]

Applicant stresses that the registration is inconsistent with the guidance provided in the USPTO's Acceptable Identification of Goods and Services Manual ("ID Manual"), which provides that simply "[s]tating that the 'downloadable mobile applications' are 'for use with mobile devices' is not acceptable" to specify the function of such applications.[12] This appeal illustrates the problems that can arise when the requirement to specify the function of a computer program such as a downloadable app is not satisfied.

---

[10] Section 1402.03(d) of the TMEP provides that "[t]ypically, indicating only the intended users, field, or industry will not be deemed sufficiently definite to identify the nature of a computer program," and the language "primarily software for travel and destination marketing organizations and travel marketing professionals" does not specify the nature of the applications because it does not explain what they do. This language instead identifies the main, but not exclusive, intended users of the goods.

[11] The language "[d]ownloadable mobile applications for mobile phones and mobile electronic devices" is not the sort of technical or vague language that would justify resort to "extrinsic evidence of use to determine the meaning of the identification of goods." *In re C.H. Hanson Co.*, 116 USPQ2d 1351, 1354 (TTAB 2015).

[12] We take judicial notice that a mobile application is also known as an "app," which is "typically a small, specialized program downloaded onto mobile devices." DICTIONARY.COM, Unabridged Random House, Inc. (www.dictionary.com, accessed on December 6, 2017).

Section 1402.03(a) of the TMEP instructs examining attorneys that the identification of goods or services in an application for registration "should state common names for goods and services, be as complete and specific as possible, and avoid indefinite words and phrases." The identifications of goods in the application and cited registration both involve mobile software applications. The ID Manual states that "[m]obile applications are software applications designed for smartphones, tablet computers, and other mobile devices, and require specification of the function of the software."[13] Because mobile applications are a type of computer program, the requirement of specifying the function of an app reflects the general requirement that computer program identifications "must be sufficiently specific to permit determinations with respect to likelihood of confusion" and to "avoid the issuance of unnecessary refusals of registration under 15 U.S.C. §1052(d) where the actual goods of the parties are not related and there is no conflict in the marketplace." TMEP Section 1402.03(d) (citing *In re Linkvest S.A.*, 24 USPQ2d 1716 (TTAB 1992)). The ID Manual provides the following form language for an acceptable description of a downloadable mobile app: "Downloadable mobile applications for {**indicate function of software, e.g., managing bank accounts, editing photos, making restaurant reservations, etc. and, if software is content- or field-specific, the content or field of use**}." ID Manual Term ID 009-4414 (effective May 9, 2013) (emphasis added).

---

[13] ID Manual note to the entry for "Downloadable mobile applications for…." (Oct. 2013 note).

We fully acknowledge the issues arising from the unrestricted identification of goods in the registration, but we lack the authority to read limitations into the identification, *In re i.am.symbolic, LLC*, 866 F.3d 1315, 123 USPQ2d 1744, 1748 (Fed Cir. 2017), including a specification of the function of the apps, or to "grant relief under Section 18 *sua sponte.*" *Cook Med. Tech.*, 105 USPQ2d at 1384 n.6.

Because the goods as identified must be deemed to be legally identical in part, this *du Pont* factor supports a finding of a likelihood of confusion.

### B.   Similarity of the Channels of Trade

Because we must deem the goods to be legally identical in part, we are obligated to assume that their channels of trade are legally identical as well, even in the absence of record evidence. *Viterra*, 101 USPQ2d at 1908; *In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968). This *du Pont* factor supports a finding of a likelihood of confusion.

### C.   Similarity of the Classes of Customers

Because we must deem the goods to be legally identical in part, we are also obligated to assume that the classes of customers are legally identical. *Viterra*, 101 USPQ2d at 1908; *Yawata Iron & Steel*, 159 USPQ at 723. The identifications of goods in the application and cited registration both contain purported restrictions on the classes of customers for the respective apps, but for the reasons discussed below, they do not negate the presumptive overlap in the classes of customers.

Applicant argues that the portion of the identification of goods in the application that states that the mobile application is "sold as 'business to consumer' (B2C)

software, and not as 'business to business' (B2B) software," identifies Applicant's customers as "the general consuming public." 4 TTABVUE 6. We take judicial notice that "B2C" is defined as "the online selling of goods and services to final customers, DICTIONARY OF BUSINESS TERMS (Thomson 2006), and "an advertising or marketing program aimed at businesses doing business directly with consumers as opposed to other businesses," THE ULTIMATE BUSINESS DICTIONARY (Perseus Publishing 2003), while "B2B" is defined as "the online selling of goods and services between businesses," DICTIONARY OF BUSINESS TERMS, and "an advertising  or marketing program aimed at businesses doing business with other businesses as opposed to consumers." THE ULTIMATE BUSINESS DICTIONARY.

We find that the identification of goods in the application indicates that the prospective purchasers of the identified goods include, but are not limited to, the general consuming public. The language "sold as 'business to consumer' (B2C) software, and not as 'business to business' (B2B) software" appears to be aspirational and marketing-related; it does not exclude that businesses (which range from sole proprietorships to large multinational corporations) could purchase the software as well.

With respect to the identification of goods in the cited registration, Applicant argues that the language "primarily software for travel and destination marketing organizations and travel marketing professionals" means that the apps "are sold only to 'travel and destination marketing organizations and travel marketing professionals,'" 4 TTABVUE 6, while the Examining Attorney argues that the

identification "does not exclude the general consuming public" as customers because it "states that the downloadable mobile applications are <u>primarily</u> (not <u>only</u>) for travel and destination marketing organizations and travel marketing professionals." 6 TTABVUE 14-15. According to the Examining Attorney, the classes of customers for "the cited goods could still include the general consuming public based on what is explicitly stated in the registration." 6 TTABVUE 15. We are again constrained to agree with the Examining Attorney.

As noted above, Section 1402.03(a) of the TMEP, entitled "Inclusive Terminology," states that an acceptable identification of goods must "avoid indefinite words and phrases." Section 1402.03(a) further provides that the "terms 'including,' 'comprising,' 'such as,' 'and the like,' 'and similar goods,' 'products,' 'concepts,' 'like services,' and other indefinite terms and phrases are almost always unacceptable," but that "the terms 'namely,' 'consisting of,' and "in particular' are definite and are preferred to set forth an identification that requires greater particularity." As discussed above, the identification of a mobile app is an "identification that requires greater particularity."

The adverb "primarily" in the identification of goods in the registration means "for the most part." MERRIAM-WEBSTER ONLINE DICTIONARY (www.merriam-webster.com, accessed on December 6, 2017). We conclude that the use of the wording "primarily software for travel and destination marketing organizations and travel marketing professionals" in the identification of goods in the cited registration does not specify the exclusive class of customers, that is, "primarily" does not limit the classes of customers for the goods to only the listed travel professionals. Nor does the reference

to travel professionals effectively specify the function of the apps. In the context of the identification, the word "primarily" is akin to the indefinite word "including," which "is used for saying that a person or thing is a part of a particular group or amount," CAMBRIDGE DICTIONARY (dictionary.cambridge.com, accessed December 6, 2017), rather than to the word "namely." We therefore find that the apps identified in the cited registration may be sold to general consumers as well as to travel professionals. We also find that Applicant's software could be purchased by businesses. Accordingly, we find that the classes of customers in the application and registration overlap. This *du Pont* factor supports a finding of a likelihood of confusion.

**Conclusion**

All of the relevant *du Pont* factors support a finding of a likelihood of confusion. The marks are very similar, the mobile software apps at issue must be deemed, in part, to perform identical functions, the channels of trade must be deemed to be identical, and the purchasers of Applicant's app must be deemed to overlap with the purchasers of the registrant's apps. On the basis of the identifications of goods in the application and cited registration, on which we must focus, we find that confusion as to the source or sponsorship of Applicant's goods is likely.

**Decision**: The refusal to register is affirmed.