# United States Court of Appeals for the Federal Circuit

05-1599
(Opposition No. 91/158,118)


M2 SOFTWARE, INC.,

Appellant,

v.


M2 COMMUNICATIONS, INC.,

Appellee.


Mark L. Pettinari, Law Offices of Mark L. Pettinari, of San Francisco, California, for appellant.

Jacquelyn Inserra, Budd Larner P.C., of Short Hills, New Jersey, for appellee. With her on the brief was Ronald James Campione.


Appealed from: United States Patent & Trademark Office Trademark Trial & Appeal Board

# United States Court of Appeals for the Federal Circuit

05-1599
(Opposition No. 91/158,118)

M2 SOFTWARE, INC.,

Appellant,

v.

M2 COMMUNICATIONS, INC.,

Appellee.

_____

DECIDED:  June 7, 2006
_____

Before MAYER, BRYSON, and PROST, <u>Circuit Judges</u>.

MAYER, <u>Circuit Judge</u>.

M2 Software, Inc. ("M2 Software") appeals the decision of the United States Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board, dismissing its opposition to M2 Communications, Inc.'s ("M2 Communications") registration of M2 COMMUNICATIONS for interactive multimedia CD-ROMs containing information on the fields of health, pharmacy, and medicine.  <u>M2 Software, Inc. v. M2 Commc'ns, Inc.</u>, Opposition No. 91/158,118 (TTAB July 21, 2005) ("<u>Board Opinion</u>").  Because the board did not err in finding no likelihood of confusion, we affirm.

Background

M2 Communications provides educational and promotional goods and services for companies within the pharmaceutical and medical industries. Its products fit within three broad categories: "live media," e.g., assistance with symposia presentations; "traditional media," e.g., educational videos for patients and printed newsletters; and "new media," e.g., interactive CD-ROMs with symposia proceedings, patient educational materials on DVD-ROMs, and website development. Approximately ninety-five percent of its clients are pharmaceutical companies, and the remaining clients are biotechnology companies and medical associations. Board Opinion at 8-9.

The board found that M2 Communications used its mark in commerce no earlier than 1998, and neither party challenges that determination. On December 26, 2001, M2 Communications applied to register the mark M2 COMMUNICATIONS (standard character form) for goods identified as:

> Interactive multimedia CD-ROMs containing educational information <u>in the fields of pharmaceutical and medical product information, therapies and strategies, and medical, pharmaceutical, and healthcare issues</u> in Class 9.

Serial No. 76352778 (emphasis added).[*] Given the restriction emphasized above, the board found that M2 Communications' mark is limited to use on goods in the pharmaceutical and medical fields. Board Opinion at 11. On September 10, 2003, M2 Software filed an opposition to the application.

M2 Software provides goods and services exclusively to the music and entertainment industries. See id. at 13-14. In so far as the record establishes, all of its

---

[*] M2 Communications' application also seeks to register its mark for services under classes 35 and 41, again with the restriction that its use be limited to services in the pharmaceutical and medical fields. M2 Software did not challenge registration of M2 COMMUNICATIONS for those services. Therefore, M2 Communications is entitled to a registration for them.

clients are in those fields, and it does not market or sell any of its products to consumers in the pharmaceutical or medical fields. Accordingly, the board concluded that any overlap between the parties' prospective purchasers or channels of trade is <u>de minimis</u>. <u>Id.</u> at 15. It further found that M2 Software first used its mark in commerce prior to 1998, thereby establishing priority both as to the trademark in question and for the purposes of establishing rights derived from its trade name and service marks. <u>Id.</u> at 6, 14-15.

M2 Software holds the registration for the mark "M2" (standard character form) for goods described as:

> computer software featuring business management applications <u>for the film and music industries</u>; and interactive multimedia applications for entertainment, education and information, <u>in the nature of artists' performances and biographical information from the film and music industries</u>; and instructions and information <u>for playing musical instruments</u>.

U.S. Registration No. 1,931,182 (emphasis added). Based on the restriction in M2 Software's registration (limiting the use of its marks to goods in the film and music industries), and the restriction in M2 Communications' application (limiting use of its mark to goods in the pharmaceutical and medical industries), the board found that M2 Communications' goods were not explicitly encompassed by the scope of goods identified in M2 Software's registration. <u>Board Opinion</u> at 11. Moreover, it found that the parties' goods were not related. <u>Id.</u> at 18. It reasoned that while both parties sell goods in the same media format, i.e., interactive CD-ROMs, that fact alone renders them neither identical nor related. <u>See id.</u> at 9-12. Instead, paramount to this case is the industry-specific focus of the parties' claimed goods. Both the registration and the application identify subsets of CD-ROMs, defined by industry, not CD-ROMs generally. The board concluded that because the claimed industries are distinct and separate, the

software prepared for them, notwithstanding similarities in media platform, are different goods. Id.

With respect to the similarity of the marks, the board found them to be "very similar." Id. at 7. M2 Communications disclaimed the term "COMMUNICATIONS," and the board, following our precedent, compared the marks as a whole, including the disclaimed term, to determine the level of similarity between them. On that basis, while recognizing the limited import of "communications" in altering the appearance, sound, meaning, and commercial impression of the challenged mark, the board declined to find the marks identical. Given that finding, because of the unrelated nature of the parties' goods, no demonstrated overlap of purchasers or channels of trade, and an absence of other factors suggesting a likelihood of confusion, the board found that confusion is not likely, and dismissed M2 Software's opposition. Id. at 18. M2 Software appeals, and we have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## Discussion

Under the Lanham Act, 15 U.S.C. § 1052(d), the PTO may refuse to register a trademark that is so similar to a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." Likelihood of confusion is a question of law, based on findings of relevant underlying facts, namely findings under the DuPont factors.[**] See Palm Bay Imps., Inc.

---

[**] When testing for likelihood of confusion, the following factors, when of record, must be considered:

(1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. (2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use. (3) The similarity or dissimilarity of established, likely-to-continue

v. Veuve Clicquot Ponsardin, 396 F.3d 1369, 1371 (Fed. Cir. 2005). "We review the board's legal conclusions de novo, and its findings of fact for substantial evidence." Shen Mfg. Co. v. Ritz Hotel Ltd., 393 F.3d 1238, 1240 (Fed. Cir. 2004) (citations omitted). Neither we nor the board, however, are required to consider every DuPont factor. Id. at 1241. Rather, we need to consider only the factors that are relevant and of record. See id. Moreover, any one factor may control a particular case. In re Dixie Rests., Inc., 105 F.3d 1405, 1407 (Fed. Cir. 1997) (citing DuPont, 476 F.2d at 1361-62).

Bearing these principles in mind, we turn to M2 Software's challenge. It contests the board's ultimate conclusion that confusion is not likely, and its findings as related to five DuPont factors: (1) the similarity of the goods in question; (2) intersecting channels of trade and purchasers; (3) the similarity of the marks; (4) the strength of its mark; and (5) M2 Communications' intent in registering its mark. We address each of the challenged determinations in turn, find them to be appropriately supported, and conclude that the board correctly determined that there is no likelihood of confusion.

The board placed the greatest weight on its findings that the goods in question were not related and that the channels of trade and purchasers are different. Because

trade channels. (4) The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing. (5) The fame of the prior mark (sales, advertising, length of use). (6) The number and nature of similar marks in use on similar goods. (7) The nature and extent of any actual confusion. (8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion. (9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark). (10) The market interface between applicant and the owner of a prior mark . . . (11) The extent to which applicant has a right to exclude others from use of its mark on its goods. (12) The extent of potential confusion, i.e., whether de minimis or substantial. (13) Any other established fact probative of the effect of use.

In re E.I. DuPont de Nemours & Co., 476 F.2d 1357, 1361 (CCPA 1973).

of the dominant role these factors play in this case, we find no error in the weight the board accorded them.

Beginning with the relatedness of the goods, the board's determination that the parties' goods were not related is supported by substantial evidence. When reviewing its conclusion, we consider the applicant's goods as set forth in its application, and the opposer's goods as set forth in its registration. See Bose Corp. v. QSC Audio Prods., 293 F.3d 1367, 1376 (Fed. Cir. 2002) (citing DuPont, 476 F.2d at 1361). The board found, and M2 Software does not challenge, that M2 Communications' goods are limited to interactive multimedia CD-ROMs in the fields of pharmacy and medicine. Any incidental music or entertainment features contained in M2 Communications' goods do not bring them within the music or entertainment fields, or alter the fact that they are produced for, and are, therefore, products within the pharmaceutical and medical fields.

By comparison, M2 Software's registration, in relevant part, describes its goods as "computer software featuring business management applications for the film and music industries; and interactive multimedia applications for entertainment, education and information, in the nature of artists' performances and biographical information from the film and music industries." U.S. Registration No. 1,931,182 (emphasis added). Accordingly, the board correctly found the scope of M2 Software's registration to be limited to the film and music industries. M2 Software argues, however, that because its registration relates to "interactive multimedia applications for entertainment, education and information," the board erred in declining to read the scope of its registration more broadly, as encompassing interactive multimedia software in any field. We disagree. Such a reading would require us to improperly ignore scope limiting language within the clause it cites, i.e., language plainly limiting its registration to goods in the music and

entertainment fields. Therefore, the board properly found that M2 Communications'
goods do not come within the actual scope of M2 Software's registration. This finding,
however, does not end the inquiry because the goods might, nevertheless, be related
based on other considerations.

M2 Software argues that the goods in question are related based on the mere
fact that they both take the form of interactive multimedia CD-ROMs. While this
argument has some merit, we reject it. As stated above, the application and registration
make clear that the relevant goods are not interactive multimedia CD-ROMs broadly
conceived, but rather CD-ROMs produced for a particular field. Here the board found
the pharmaceutical and medical fields to be distinct from the music and entertainment
fields, which we affirm below. Therefore, it was proper for the board to ground its
determination of relatedness in the fields for which the goods are created, rather than
the media format in which they are delivered. This subject-matter-based mode of
analysis is consistent with our precedent, see, e.g., Octocom Sys., Inc. v. Houston
Computer Servs., Inc., 918 F.2d 937, 941 (Fed. Cir. 1990), and the board's precedent,
see, e.g., Elec. Data Sys. Corp. v. EDSA Micro Corp., 23 USPQ2d 1460, 1463 (TTAB
1992) ("[T]he fact that both parties provide computer programs does not establish a
relationship between the goods or services, such that consumers would believe that all
computer software programs emanate from the same source simply because they are
sold under similar marks."). Moreover, given the pervasiveness of software and
software-related goods in society, it would be inappropriate to presume relatedness on
the mere basis of goods being delivered in the same media format, especially where, as
here, the goods described in both the application and registration are defined narrowly,
along distinct industry lines.

Further supporting the board's determination is that M2 Software's actual business activities are limited to the film and music industries. It did not introduce any evidence that it sells goods or services beyond those fields or within the fields of pharmacy or medicine; nor did it introduce any evidence that it is likely to expand into the pharmaceutical or medical fields. Therefore, to the extent that its trade name and service marks might have afforded it protection beyond that secured by its registration, nothing in the record supports extending any such protection here. Cf. Shen Mfg., 393 F.3d at 1244 ("[G]oods that are neither used together nor related to one another in kind may still 'be related in the mind of the consuming public as to the origin of the goods. It is this sense of relatedness that matters in the likelihood of confusion analysis.'" (citing Recot, Inc. v. Becton, 214 F.3d 1322, 1329 (Fed. Cir. 1992))).

Relatedly, with respect to the third DuPont factor, the board found, and we agree, that the parties' channels of trade and purchasers are different. M2 Software concedes that all of its known customers are in the music or entertainment industries. Furthermore, its marketing targets those industries. By comparison, M2 Communications deals only with pharmaceutical and medical customers, and all of its marketing is directed towards those fields. Neither party submitted any evidence of inherent overlap of customers or trade channels between the pharmaceutical and medical industries, on one hand, and the music and entertainment industries, on the other. Although both parties operate websites, that fact, without more, is insufficient to overcome the vast weight of evidence establishing that no overlap exists. Therefore, substantial evidence supports the board's conclusion that any overlap in this factor is de minimis.

Citing 15 U.S.C. § 1125(a),[***] M2 Software nevertheless argues that the board erred in failing to consider confusion as to affiliation, connection, association, sponsorship, or approval in the software trade. However, it did not introduce any direct evidence suggesting the existence of such confusion, and the absence of any demonstrated overlap as to the parties' channels of trade or purchasers eliminates any basis from which one might infer it. Therefore, even if the section 1125(a) elements are applicable to a section 1052(d) opposition, whether through the third or thirteenth DuPont factor, the board committed no error in failing to explicitly consider them. Indeed, it is required to consider only those factors that are of record, see Shen Mfg., 393 F.3d at 1241, which is not the case here.

The unrelated nature of the parties' goods and their different purchasers and channels of trade are factors that weigh heavily against M2 Software. It is difficult to establish likelihood of confusion in the absence of overlap as to either factor. Analysis of the remaining aspects of M2 Software's challenge confirms the correctness of the board's ultimate conclusion.

Turning to the similarity of the marks, M2 Software owns the registered trademark "M2" in standard character form. U.S. Registration No. 1,931,182. The board's finding that the marks in question are "very similar" is supported by substantial

---

[***]  15 U.S.C. § 1125(a)(1)(A) provides in pertinent part:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

evidence.  See Board Opinion at 7.  When comparing the similarity of marks, a disclaimed term, here "COMMUNICATIONS," may be given little weight, but it may not be ignored.  See In re Hearst Corp., 982 F.2d 493, 494 (Fed. Cir. 1992).  Accordingly, while the board found the "M2" portion of the marks to be identical and that the disclaimed term did not create any significant difference in meaning or commercial impression, it did not err in finding that the marks, when considered as a whole, were not identical.  In its likelihood of confusion analysis, the board appropriately weighed this factor as favoring M2 Software.

Next, M2 Software argues that the board failed to give sufficient weight to the strength of its mark.  It asserts, and M2 Communications does not dispute, that its mark is fanciful, and, therefore, inherently distinctive and deserving of heightened trademark protection.  See Nautilus Group, Inc. v. Icon Health & Fitness, Inc., 372 F.3d 1330, 1340 (Fed. Cir. 2004).  However, the board explicitly rejected the notion that third-party usage of "M2" rendered M2 Software's mark weak, Board Opinion at 18, and stated that factors other than DuPont factors one, two, and three did not alter the outcome dictated by those three factors alone, id. at 16.  Therefore, we can fairly infer that the board gave due consideration to the fanciful nature of M2 Software's mark.  Moreover, we agree that, in view of the degree to which factors one and three weigh in M2 Communications' favor, heightened protection deriving from the fanciful nature of M2 Software's mark does not affect the finding of no likelihood of confusion.

Finally, M2 Software argues that the board erred in finding no bad intent in M2 Communications' application for its mark.  However, M2 Communications established before the board that it adopted its mark because, in its conception of the term, "M2" was shorthand for "medical marketing."  Id. at 18.  It further provided an uncontroverted

statement that it was unaware of M2 Software's mark when it designed the M2 COMMUNICATIONS mark. Id. While a finding of bad intent would alter the likelihood of confusion analysis in M2 Software's favor, substantial evidence supports the board's conclusion that M2 Communications' intent is not a factor favoring M2 Software.

Therefore, because the DuPont factors favoring M2 Communications, i.e., the unrelated nature of the parties' goods and the fact that the marks are used in different channels of trade and with respect to different purchasers, outweigh the factors favoring M2 Software, i.e., the similarity of the marks and the fanciful nature of its mark, the board properly found that confusion was not likely.

Conclusion

Accordingly, the judgment of the United States Patent and Trademark Office Trademark Trial and Appeal Board is affirmed.

AFFIRMED

05-1599                                          11