This Opinion is a
Precedent of the TTAB

Mailed: June 7, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

‾‾‾‾

Trademark Trial and Appeal Board

‾‾‾‾

*In re I-Coat Company, LLC.*

‾‾‾‾

Serial Nos. 86802467; 86802618 and 86802733[1]

‾‾‾‾

Gary L. Eastman of Eastman & McCartney LLP,
   for I-Coat Company, LLC.

Jonathan Ryan O'Rourke, Trademark Examining Attorney, Law Office 104,
   Dayna Browne, Managing Attorney.

‾‾‾‾

Before Cataldo, Wellington and Goodman, Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

I-Coat Company, LLC (Applicant) seeks registration on the Principal Register of

the following marks, all filed on October 28, 2015 under Section 1(a) of the Trademark

Act, 15 U.S.C. § 1051(a), on the basis of Applicant's allegation of July 1, 2015 as a

---

[1] The Examining Attorney's November 16, 2017 motion to consolidate these proceedings (11 TTABVUE) was granted in a Board order issued on November 21, 2017 (12 TTABVUE). The records in these consolidated appeals are essentially identical, and we will refer in this decision to the record in application Serial No. 86802467 unless otherwise noted.

Page references herein to the application record refer to the downloadable .pdf version of the USPTO's Trademark Status & Document Retrieval (TSDR) system. References to the briefs, motions and orders on appeal refer to the Board's TTABVUE docket system. *See* Trademark Board Manual of Procedure (TBMP) § 1203.01 (June 2017).



date of first use in commerce: INDIGO (in standard characters);[2]



("AR" disclaimed);[3] and ("AR" disclaimed);[4] all identifying "optical lenses, namely, corrective lenses sold through eye care professionals" in International Class 9.

The Trademark Examining Attorney has refused registration of all three applications under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's marks, as used in connection with the goods identified in the applications, so resemble the following marks, previously registered to the same entity on the Principal Register, as to be likely to cause confusion, to cause mistake, or to deceive:

---

[2] Application Serial No. 86802467.

[3] Application Serial No. 86802618. The mark consists of a square-like figure with the upper right corner folded just beyond the middle of the square; the word "INDIGO", outlined in white, begins on the fold; to the lower right of the word "INDIGO" are the letters "AR". Shades of gray are below and behind the word "INDIGO". Color is not claimed as a feature of the mark.

[4] Application Serial No. 86802733. The mark consists of a square-like figure with the lower left corner and the upper right corner the color pink blending into purple, and blue in the middle. The upper right corner of the square appears to be folded inward just beyond the middle of the square, with the color black used on the outside of the folded corner design for shading and a white line inside the corner design for dimension. The word "INDIGO" appears in a stylized purple font outlined in white, beginning with the "I" over the right side of the square. Below and behind the word "INDIGO" is a rainbow design starting on the left with the color blue, which blends into the color green, which blends into the color yellow, which blends into the color orange, which blends into the color red. To the right and below the word "INDIGO" are the letters "AR" in a stylized black font. Other than as described above, the color white shown in the drawing represents transparent areas and is not part of the mark. The colors pink, purple, blue, green, yellow, orange, red, white, and black are claimed as a feature of the mark.

INDIGOSNOW (in standard characters) identifying, *inter alia*, "Spectacles, spectacle cases, spectacle lenses, spectacle settings, spectacle frames, glasses for sport, protective helmets for sports, binoculars, parts of these goods included in this class" in International Class 9;[5] and

INDIGO (in standard characters) for "ski glasses, ski goggles, goggles for sports, protective sport helmets; sunglasses, bags specifically adapted for protective helmets" in International Class 9.[6]

After the Examining Attorney made the refusals final, Applicant appealed. We affirm the refusal to register as to each application.

## I. Evidentiary Objection

With its July 10, 2017 Request for Reconsideration, Applicant submitted as evidence: printouts retrieved from the USPTO's Trademark Electronic Search System (TESS) of three third-party registrations for INDIGO-formative marks; and screenshots from five third-party Internet websites displaying the term INDIGO used in connection with eyewear.[7] In his August 16, 2017 Denial of Applicant's Request for Reconsideration, the Examining Attorney objected to all of this evidence on the following basis (emphasis in original):

> The examining attorney objects to the new website evidence submitted by the applicant, as it was not properly submitted to the record. To make Internet materials part of the record, an applicant must provide (1) an image file or printout of the actual downloaded webpage, and **(2)**

---

[5] Registration No. 4766333 issued on July 7, 2015. The registration also recites goods in Classes 3, 18, 25 and 28 that are not relevant to the refusal of registration.

[6] Registration No. 4791139 issued on August 11, 2015.

[7] At .pdf 9-42.

**complete information as to the date the evidence was published or accessed from the Internet, and its source** (e.g., the complete URL address of the website). [Internal cites omitted.] In this case, no dates were provided, and many of the URL addresses are cut off or incomplete.[8]

With its appeal brief, Applicant submitted the declaration of its counsel, Gary L. Eastman, and accompanying exhibits that included: copies of two of the third-party registrations it introduced with its Request for Reconsideration, and screenshots from third-party websites that are similar, but not identical, to the website evidence submitted with its Request for Reconsideration.[9] In his declaration, Mr. Eastman indicates the URLs for these exhibits as well as the dates upon which they were accessed.[10] Applicant asserts that it "lists the marks below and resubmits this evidence with appropriate dates and URLs for the Board's consideration."[11] In his brief, the Examining Attorney objected to this evidence on the ground that it is untimely.[12] Applicant did not submit a reply brief.

A. Evidence Submitted with Request for Reconsideration

When submitting webpage evidence, the Trademark Manual of Examining Procedure (TMEP) instructs an examining attorney to include the URL of the website and the date the excerpt was accessed. TMEP § 710.01(b) (October 2017). *Cf. Edom Labs. Inc. v. Lichter*, 102 USPQ2d 1546, 1550 (TTAB 2012) (webpages inadmissible

---

[8] At .pdf 3.

[9] 9 TTABVUE 13-34.

[10] *Id*. at 13-14.

[11] *Id*. at 6.

[12] 13 TTABVUE 4-5.

because they did not include the URL). The requirement that materials printed from websites must include a date and source/URL applies equally to evidence submitted by examining attorneys in *ex parte* cases as it does to parties involved in *inter partes* cases because it ensures that an applicant can verify the information presented in the case. *Cf. Safer Inc. v. OMS Invs. Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010) (holding that an Internet printout may be admissible pursuant to a notice of reliance as long as it "identifies the date of publication or date that it was accessed and printed, and its source (e.g., the URL)").[13]

Material obtained through the Internet generally is acceptable as evidence in *ex parte* proceedings. *See* TBMP § 1208.03 (June 2017). It has been the Board's past practice to prefer, but not require, that a webpage submitted by an applicant "be identified by the full address (url) for the web page, and the date it was downloaded, either by the information printed on the web page itself, or by providing this information in an Office action or an applicant's response." TBMP § 1208.03; *see also In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 1245 n.6 (TTAB 2010) (pointing out preference for full address (URL) for webpages and dates pages were downloaded).[14]

---

[13] Effective January 14, 2017, the Board's decision in *Safer* was codified as amended Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), applicable to inter partes proceedings.

[14] The addresses of Internet printouts (URLs) and access dates may be provided "either by the information printed on the webpage itself, or by providing this information in an Office action or an applicant's response." *Id.* The better practice is to print or otherwise display the URL and access date on the documents themselves so that the non-offering party may readily verify the document through the date and source information and, if inaccurate, rebut the probative value of the document by showing that there has been a significant change to the document as submitted by the offering party. Alternately, the URLs and access dates may be provided by declaration.

Although the Board generally takes a somewhat more permissive stance with respect to the admissibility of evidence in an *ex parte* proceeding than in an *inter partes* proceeding, if a webpage is submitted without a URL or date the page was accessed or printed, the evidence lacks authenticity and cannot be readily verified by the non-offering party. Accordingly, we have recently held that to properly make such website evidence of record, a trademark examining attorney must include the URL and the date when the material was accessed, and that if an examining attorney fails to do so, and the applicant objects, the material will not be considered. *See In re Mueller Sports Medicine, Inc.*, 126 USPQ2d 1584, 1587 (TTAB 2018); *see also* TMEP § 710.01(b) (October 2017). We further stated our intention in *Mueller Sports Medicine* to hold applicants to the same standard. *Id.*

In accordance with our decision in *Mueller Sports Medicine*, we will no longer consider Internet evidence filed by an applicant in an *ex parte* proceeding to be properly of record unless the URL and access or print date has been identified, either directly on the webpage itself, or by providing this information in a response, except where the examining attorney does not object.

> If the applicant's response includes Internet evidence without a URL or date it was printed, the examining attorney must object to the evidence in the first Office action following the response and advise the applicant as to the proper way to make the Internet evidence of record. Otherwise the Board may consider the objection to be waived.

*Id. Cf., e.g., In re ActiveVideo Networks, Inc.*, 111 USPQ2d 1581, 1594 n.40 (TTAB 2014) (objection waived where examining attorney, in a continuing refusal, failed to advise applicant that mere listing of third-party registrations was insufficient to

make them of record). If the applicant files an appeal, the Examining Attorney should continue the objection to the evidence in his or her appeal brief. *In re Mueller Sports Medicine, Inc.*, 126 USPQ2d at 1587.

In this case, because Applicant submitted its evidence during prosecution of the involved applications prior to our adoption of these requirements, we have considered the website information submitted by Applicant with its Request for Reconsideration.

### B. Evidence Submitted with Applicant's Brief

As discussed *supra*, we have considered Applicant's evidence submitted with its Request for Reconsideration. To the extent Applicant submitted with its appeal brief evidence that is duplicative of the evidence previously submitted with its Request for Reconsideration, we need not and do not give this redundant evidence any consideration in light of our determination above. Any of the evidence submitted with Applicant's appeal brief that was not previously submitted during prosecution is untimely and will not be considered.[15] *See* Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d); TBMP § 1203.02(e) and § 1207.01 and authorities cited therein.

We turn now to the merits of these consolidated appeals.

## II. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of

---

[15] The proper procedure for an applicant or examining attorney to introduce evidence after an appeal has been filed is to submit a written request with the Board to suspend the appeal and remand the application for further examination. *See* Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d). *See also* TBMP § 1207.02 and authorities cited therein.

confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, however, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

### 1.  Cited Registration No. 4791139

For purposes of the *du Pont* factors that are relevant to these appeals we will consider Applicant's involved marks and identified goods and the INDIGO mark that is the subject of cited Registration No. 4791139, identifying "ski glasses, ski goggles, goggles for sports, protective sport helmets; sunglasses, bags specifically adapted for protective helmets." If likelihood of confusion is found as to the mark and goods in this registration, it is unnecessary to consider the other cited registration. Conversely, if likelihood of confusion is not found as to the mark and goods in this registration, we would not find likelihood of confusion as to the mark and goods in the other cited registration. *See Max Capital Grp. Ltd.*, 93 USPQ2d at 1245.

### 2.  Strength of the Mark in the Cited Registration

Applicant argues that:

> In light of the frequency of "indigo" in marks using the same goods and channels of trade as the Registered Marks, consumers will not rely solely on the word in order to distinguish their source. Accordingly, the weight of the du Pont factors relied on by the Examining Attorney is

significantly diminished … and other du Pont factors discussed below should be given more weight.[16]

In support of this contention, Applicant introduced into the record with its July 10, 2017 Request for Reconsideration copies of the following three third-party registrations for marks issued on the Principal Register:[17]

Reg. No. 4448891 for the mark GREAT NORTHWEST INDIGO (standard characters, "INDIGO" disclaimed) identifying "sunglasses" in Class 9 and additional goods in Class 25;

Reg. No. 4460424 for the mark **INDIGOFERA** (stylized, with the following translation: "The word INDIGOFERA is a generic name for a plant family") identifying "sunglasses, sun visors in the nature of eyewear, cases adapted for sunglasses," in Class 9 and additional goods in Classes 14, 18 and 25; and

Reg. No. 4199748 for the mark INDIGO SCHUY (standard characters, "The wording INDIGO SCHUY has no meaning in a foreign language.") identifying "retail stores and on-line retail store services featuring clothing, footwear, headwear, apparel, active apparel, sports apparel, fashion accessories, jewelry, watches, eyewear," in Class 35.

With its July 10, 2017 request for reconsideration, Applicant also introduced into the record screenshots from the following third-party websites showing the term INDIGO or another term used in connection with various forms of eyewear:[18]

Indigoeyewear.com displays the term INDIGO in connection with eyeglass frames;[19]

Fairends.com displays INDIGO SUNGLASSES in connection with a style of sunglasses;

---

[16] 10 TTABVUE 8.

[17] At .pdf 9-17.

[18] At .pdf 18-42.

[19] We observe that while this website is in English, its owner is located in Poland, and it is not clear whether the goods offered thereby are available in the United States.

> Targetoptical.com displays INDIGO COLLECTION in connection with a line of, *inter alia*, eyeglasses and sunglasses; and

> Madewell.com displays INDIO SUNGLASSES in connection with a style of sunglasses.

In determining the degree of weakness, if any, in the shared terms, we must "adequately account for the apparent force of [third-party use and registration] evidence," regardless of whether "specifics" pertaining to the extent and impact of such use have been proven. *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674-5 (Fed. Cir. 2015). While the "existence of [third party] registrations is not evidence of what happens in the market place or that customers are familiar with them," *AMF Inc. v. American Leisure Prods., Inc.*, 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973), "extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established." *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015), citing *Juice Generation*, 115 USPQ2d at 1674.

Turning first to the Internet evidence, Applicant has made of record a total of, at best, three third-party uses of INDIGO formative marks: one in connection with eyeglass frames; and two in connection with eyeglasses, including sunglasses. The fourth does not appear to use a formative of INDIGO as a mark, but rather displays INDIO SUNGLASSES as a mark. While Applicant has not presented specific evidence concerning the extent and impact of these uses, it nevertheless presented "evidence of these marks being used in internet commerce"

for eyewear and eyewear frames. *Jack Wolfskin*, 116 USPQ2d at 1136; *see also Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1072 (TTAB 2011) (internet printouts "on their face, show that the public may have been exposed to those internet websites and therefore may be aware of the advertisements contained therein"). However, unlike cases in which extensive evidence of third-party use and other evidence in the record was found to be "powerful on its face" inasmuch as "a considerable number of third parties['] use [of] similar marks was shown," *Juice Generation*, 115 USPQ2d at 1674, Applicant has presented, at most, three such uses, well short of the volume of evidence found convincing in *Jack Wolfskin* and *Juice Generation*.

We turn next to the three third-party registrations introduced into the record by Applicant. Registration No. 4448891 for the mark GREAT NORTHWEST INDIGO identifies sunglasses, but includes other wording not present in any of the involved marks, causing the mark to significantly differ from the mark in the cited registration. Registration No. 4460424 for the mark INDIGOFERA also identifies sunglasses, but significantly differs from the cited and involved marks and consists of a generic name for a plant family. Registration No. 4199748 for the mark INDIGO SCHUY, also differs in appearance, sound and meaning from the involved marks, including the undefined term SCHUY and identifies retail services featuring, *inter alia*, eyewear. Only two of the three third-party registrations recite goods identified in the cited registration, and none of the marks are as similar to the mark in the cited registration as is Applicant's mark. *See, e.g., Specialty Brands, Inc. v.*

*Coffee Bean Distributors, Inc.*, 748 F.2d 669, 223 USPQ 1281, 1284-85 (Fed. Cir. 1984) ("Applicant introduced evidence of eight third-party registrations for tea which contain the word 'SPICE', five of which are shown to be in use. None of these marks has a 'SPICE (place)' format or conveys a commercial impression similar to that projected by the SPICE ISLANDS mark, and these third-party registrations are of significantly greater difference from SPICE VALLEY and SPICE ISLANDS than either of these two marks from each other.")

The totality of the evidence presented by Applicant fails to show that the term INDIGO as it appears in the cited mark and involved marks is significantly weak in connection with the involved goods. As a result, the evidence fails to show that the cited mark should be afforded such a narrow scope of protection that it would weigh in favor of finding a likelihood of confusion.

### 3. *Similarity or Dissimilarity of the Marks*

We address the *du Pont* likelihood of confusion factor focusing on "the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). "The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (quotation omitted).

Because the similarity or dissimilarity of the marks is determined based on the marks in their entireties, our analysis cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on the entire marks, not just part of the marks. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). On the other hand, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *Nat'l Data*, 224 USPQ at 751.

The cited INDIGO mark in standard characters is identical in all respects to the INDIGO mark in standard characters in Application Serial No. 86802467.

The cited INDIGO mark in standard characters is similar to Applicant's

mark, with "AR" disclaimed, in Application Serial No. 86802618 inasmuch as the most prominent feature of Applicant's mark is the term INDIGO. Evidence of record establishes that AR is a recognized acronym for "anti-reflective," and identifies a significant feature of the identified goods.[20] "Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'" *Cunningham v.*

---

[20] February 22, 2016 First Office action at .pdf 28-40.

*Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) (quoting *Nat'l Data*, 224 USPQ at 752). This tribunal also has found that disclaimed matter is often "less significant in creating the mark's commercial impression." *In re Code Consultants, Inc.*, 60 USPQ2d 1699, 1702 (TTAB 2001). However, while "a disclaimed term … may be given little weight … it may not be ignored." *M2 Software Inc. v. M2 Communications Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1948-49 (Fed. Cir. 2006).

In this case, the descriptive term AR is also displayed in much smaller size than the term INDIGO, and thus is less visually prominent in addition to less distinctive with regard to meaning. *See, e.g.*, *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1062 (Fed. Cir. 2003) (where the "Blue Moon Brewing Co." appeared "at the bottom of the mark in significantly smaller font, it was reasonable for the Board to find that those words do not significantly contribute to distinguishing the two marks"). Similarly, the rectangle with a folded corner design, while prominent in size, does not create a commercial impression that is separate from the wording INDIGO AR, but rather serves to frame the wording and draw more attention thereto. It further is settled that in a mark consisting of wording and a design, the design tends to make a less significant contribution to the mark's overall commercial impression. *See, e.g., In re Viterra Inc.*, 671 F.2d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012) ("the verbal portion of a word and design mark likely will be the dominant portion"). Finally, we note that INDIGO, the term which the marks share in common, and the entirety of the registered mark, is also the first term and dominant part of this mark. *Presto Products, Inc. v. Nice-Pak Products Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988)

("…[it is] a matter of some importance since it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered."). *See also Palm Bay Imps.*, 73 USPQ2d at 1692 ("The presence of this strong distinctive term as the first word in both parties' marks renders the marks similar, especially in light of the largely laudatory (and hence non-source identifying) significance of ROYALE."). We find, therefore, that the cited mark INDIGO and Applicant's mark

are more similar than dissimilar in appearance and sound. To the extent the term INDIGO has any meaning with regard to the involved goods, there is no evidence of record to support a finding that the term would have a different meaning as applied to Applicant's goods as it would when applied to the goods in the cited registration. We find, as a result, that the marks are similar in connotation and, overall, convey similar commercial impressions.

For the reasons discussed above, we also find that the cited INDIGO mark in

standard characters is similar to Applicant's color mark with "AR" disclaimed, in application Serial No. 86802733. This mark also consists of the prominent, distinctive term INDIGO, the disclaimed and descriptive term AR, and a rectangle design with a folded corner, displayed in this instance in a rainbow of colors. The display of the rectangular design and folded corner in colors, while visually striking, does not diminish the visual, aural and connotative significance of the dominant term INDIGO. We acknowledge that the additional term AR and the design serve to visually and aurally distinguish the Applicant's marks and the cited mark.

However, the only distinctive term in Applicant's composite marks is INDIGO, which is the entirety of the registered mark. This common identical term results in marks that, as discussed above, are similar in sound, appearance, meaning, and commercial impression.

We find, as a result, that Applicant's word mark is identical to the cited mark, and the differences between the cited mark and Applicant's composite marks are outweighed by their similarity in appearance, sound and meaning. Considered in their entireties, we find that the marks convey similar overall commercial impressions.

### 4. Relatedness of the Goods, Their Trade Channels and Consumers

We next consider the *du Pont* factors addressing the similarity of the goods, the channels of trade in which they may be encountered and the purchasers to whom they are marketed. We are mindful that the test is not whether consumers would be likely to confuse these goods, but rather whether they would be likely to be confused as to their source. *In re Anderson*, 101 USPQ2d 1912, 1919 (TTAB 2012). Therefore, to support a finding of likelihood of confusion, it is not necessary that the goods be identical or even competitive. It is sufficient that the goods are related in some manner, or that the circumstances surrounding their marketing are such that they would be encountered by the same persons in situations that would give rise, because of the marks, to a mistaken belief that they originate from the same source or that there is an association or connection between the sources of the goods. *In re Thor Tech Inc.*, 90 USPQ2d 1634, 1635 (TTAB 2009).

We must look to the goods as identified in the involved applications and cited registration, not to any extrinsic evidence of actual use. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014). Because there are no limitations as to channels of trade or classes of purchasers in the recitation of goods in the cited registration, we must presume that the identified goods move in all channels of trade normal for such goods and are available to all potential classes of ordinary consumers of such goods. *See Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981).

Applicant's goods in all three applications are "optical lenses, namely, corrective lenses sold through eye care professionals" and the goods in the cited registration are "ski glasses, ski goggles, goggles for sports, protective sport helmets; sunglasses, bags specifically adapted for protective helmets." In support of the refusal of registration, the Examining Attorney introduced with his January 9, 2017 Final Office Action[21] and August 16, 2017 Denial of Applicant's Request for Reconsideration[22] printouts from the following third-party Internet websites offering under the same mark both optical lenses in the nature of corrective lenses and sunglasses, as well as, in some instances, ski goggles and sport goggles.

> ray-ban.com/usa provides sunglasses, glasses for sport, and optical lenses in the nature of corrective lenses;

---

[21] At .pdf 33-145.

[22] At .pdf 5-39.

warbyparker.com provides sunglasses and optical lenses in the nature of corrective lenses;

mauijim.com provides sunglasses and optical lenses in the nature of corrective lenses;

julbo.com provides sunglasses and optical lenses in the nature of corrective lenses;

smithoptics.com/us provides sunglasses and optical lenses in the nature of corrective lenses;

oakley.com provides sunglasses, ski goggles, goggles for sports, ski glasses and optical lenses in the nature of corrective lenses; and

lenscrafters.com provides sunglasses and optical lenses in the nature of corrective lenses.

In addition, the following third-party websites show sunglasses and optical lenses in the nature of corrective lenses offered in the same channels of trade:[23] coastal.com/eyewear; eyeconic.com; replacementlensexpress.com; and framesdirect.com.

This evidence demonstrates that at least seven third parties identify both Applicant's goods and the goods in the cited registration under the same mark, and at least four additional parties offer these goods under different marks, but in a common channel of trade.

The Examining Attorney further introduced into the record with his January 9, 2017 Final Office Action[24] and August 16, 2017 Denial of Applicant's Request for

---

[23] *Id.*

[24] At .pdf 146-173.

Reconsideration[25] copies of eleven use-based, third-party registrations for marks identifying, *inter alia*, both optical lenses and sunglasses. The following examples are illustrative:[26]

> Registration No. 4635375 for the mark RAYG (in stylized form) identifying "sunglasses, diffraction glasses, optical glasses, optical lenses, ophthalmic lenses, spectacle lenses;"

> Registration No. 4972180 for the mark MONRICH (in stylized form) for "sunglasses, eyeglasses, contact lenses, optical corrective lenses, cases for eyeglasses, spectacle lenses, spectacle frames, spectacle cases, pince-nez, spectacle cases;" and

> Registration No. 5054121 for the mark MAXIMUS (in standard characters) for goods including "eyeglass lenses, goggles for sports, lenses for sunglasses, optical lenses, protective eyeglasses, sunglasses."

As a general proposition, although use-based, third-party registrations alone are not evidence that the marks shown therein are in use or that the public is familiar with them, they nonetheless may have some probative value to the extent they may serve to suggest that the goods are of a kind that emanate from a single source. *See In re Infinity Broad. Corp.*, 60 USPQ2d 1214, 1217-18 (TTAB 2001); *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993); *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1988); *see also Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (evidence that "a single company sells the goods and services of both parties, if presented, is relevant to the relatedness analysis"). In this case, we recognize that consumers are able to distinguish Applicant's goods from the goods in the cited registration; however, that

---

[25] At .pdf 40.

[26] At .pdf 7-74.

is not the standard. *See, e.g.*, *Hydra Mac, Inc. v. Mack Trucks, Inc.*, 507 F.2d 1399, 184 USPQ 351 (CCPA 1975) ("the confusion found to be likely is not as to the products but as to their source") (citation omitted); *In re Anderson*, 101 USPQ2d at 1919. Here, the totality of the Internet and third-party registration evidence demonstrates that consumers would readily expect that these goods emanate from the same sources.

While Applicant's goods are limited to sale "through eye care professionals," the identification of goods in the cited registration does not recite any limitations as to the channels of trade in which Registrant's goods are or will be offered. In the absence of trade channel limitations in the goods under the registered mark, we must presume that the goods in the cited registration are offered in all customary trade channels, which include eye care professionals. *See Citigroup Inc.*, 98 USPQ2d at 1261; *Jump Designs*, 80 USPQ2d at 1374; *Elbaum*, 211 USPQ at 640. As a result, we find unpersuasive Applicant's arguments and evidence seeking to impose trade channel limitations on the goods in the cited registration. "We have no authority to read any restrictions or limitations into the registrant's description of goods." *In re Thor Tech Inc.,* 90 USPQ2d at 1638. Nor may an applicant restrict the scope of the goods covered in a cited registration by argument or extrinsic evidence. *In re Midwest Gaming & Entertainment LLC*, 106 USPQ2d 1163, 1165 (TTAB 2013); *In re La Peregrina Ltd.*, 86 USPQ2d 1645, 1647 (TTAB 2008); *In re Bercut-Vandervoort & Co.*, 229 USPQ 763, 764 (TTAB 1986). Further, as noted above, the Examining Attorney has introduced evidence that both corrective lenses and sunglasses are offered for sale on the same

webpages. This evidence supports a finding that these goods are offered in at least one common channel of trade, in some cases under the same marks.

### 5. *Sophistication of Purchasers*

Applicant urges us to consider consumer sophistication. Beyond inferences we can draw from the goods themselves, there is nothing in the record that would give us additional insight as to the possible sophistication of consumers of corrective lenses, ski and sport goggles, and sunglasses. *See, e.g.*, *Gen. Aniline & Film Corp. v. Hukill Chem. Corp.*, 287 F.2d 926, 129 USPQ 147, 148 (CCPA 1961) ("There is no evidence other than the nature of the goods themselves from which we can determine whether purchasers of applicant's goods defined in the opposed application are discriminating purchasers and as such are 'probably informed and wary.'"). To the extent we accept that these related goods may be marketed to more careful purchasers seeking vision correction on one hand and vision enhancement or eye protection on the other, we expect that with identical or similar marks used on such goods, even a careful, sophisticated consumer of these goods is likely to believe that the goods emanate from a common source. *Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1846. In other words, even careful purchasers who do notice the difference in the marks will not ascribe it to differences in the source of the goods, but will see the marks as variations of each other, pointing to a single source.

### 6. *Summary*

Considering all the evidence of record, including any evidence not specifically discussed herein, we find that the marks in their entireties are, respectively, identical

or more similar than dissimilar, and that the identified goods are related and travel in common trade channels to the same consumers. Applicant's modest evidence of third-party use and registration of similar marks is insufficient to mitigate in favor of a finding of no likelihood of confusion. Purchaser sophistication we find neutral. We conclude, therefore, that Applicant's marks are likely to cause confusion with the mark in the cited registration when used in association with the identified goods.

**Decision**: The refusal to register Applicant's marks on the ground of likelihood of confusion is affirmed as to all three applications.