# United States Court of Appeals for the Federal Circuit

---

**APEX BANK,**
*Appellant*

**v.**

**CC SERVE CORP.,**
*Appellee*

---

2023-2143

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91254295.

---

Decided: September 25, 2025

---

MICHAEL J. BRADFORD, Luedeka Neely, P.C., Knoxville, TN, argued for appellant. Also represented by ROBERT FOX.

AUSTIN PADGETT, Troutman Pepper Locke LLP, Atlanta, GA, argued for appellee.

---

Before MOORE, *Chief Judge*, HUGHES and CUNNINGHAM, *Circuit Judges*.

HUGHES, *Circuit Judge*.

Apex Bank appeals a decision of the Trademark Trial and Appeal Board refusing registration of Apex's marks. Because the Board erred in its analysis of two of the factors of the likelihood-of-confusion analysis, we affirm-in-part, vacate-in-part, and remand.

I

CC Serve is a company that offers credit card services to customers. J.A. 6927–28. CC Serve is the owner of Registration No. 2126948 for the word mark ASPIRE used in connection with credit card services. *Id.* The ASPIRE mark registration was issued in 1998 and has an effective priority date of October 17, 1996. *Id.* CC Serve offers credit card services in connection with the ASPIRE mark—CC Serve joins with a bank, and the bank issues ASPIRE-branded credit cards and associated accounts to customers. J.A. 6930. The accounts are serviced by CC Serve and its affiliates. *Id.*

Apex Bank is a retail bank chartered in Tennessee. J.A. 7029. It has 18 branch locations and offers personal checking accounts, personal savings accounts, business checking accounts, home mortgages, and consumer and business loans. *Id.* It does not offer credit cards. *Id.* Apex plans to offer an internet bank under a different brand, using the ASPIRE BANK word and design marks. J.A. 5243.

In August 2019, Apex filed intent-to-use applications with the United States Patent and Trademark Office to register the ASPIRE BANK word and design marks for "[b]anking and financing services." J.A. 7027. During prosecution, CC Serve submitted a letter of protest asserting that Apex's proposed marks were confusingly similar to CC Serve's mark. J.A. 4576. Nonetheless, the examining attorney approved the ASPIRE BANK word and design marks for publication, and the marks published on December 17, 2019. J.A. 4569–70.

CC Serve initiated an opposition to Apex's marks in February 2020, alleging a likelihood of confusion with CC Serve's standard character mark, ASPIRE. J.A. 2, 6931. The Board sustained the opposition under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), concluding that consumer confusion between the marks was likely. J.A. 63.

Apex appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## II

"We review the [B]oard's legal conclusions *de novo*, and its findings of fact for substantial evidence." *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1382 (Fed. Cir. 2006) (internal citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

A trademark opposition under Section 2(d) of the Lanham Act requires registration refusal when "confusion is likely because of concurrent use of the marks of an applicant and a prior user on their respective goods." *Application of E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1360 (C.C.P.A. 1973). "Likelihood of confusion is a question of law, based on findings of relevant underlying facts, namely findings under the *DuPont* factors." *M2 Software*, 450 F.3d at 1381. "Each of the [thirteen] *DuPont* factors presents a question of fact, findings with regard to which we test for substantial evidence when called into question on appeal." *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002). The Board need not consider every *DuPont* factor, only those "that are relevant and of record." *M2 Software*, 450 F.3d at 1382.

## III

On appeal, Apex argues that the Board erred in its likelihood-of-confusion analysis, specifically with respect to its analysis of the second, sixth, and first *DuPont* factors. The

Board concluded that the sixth *DuPont* factor did not weigh in favor of Apex, and that the first and second *DuPont* factors weigh in favor of CC Serve. J.A. 62–63. We address each factor in turn.

## A

The second *DuPont* factor assesses the similarity of the parties' goods and/or services. The services need not be identical—the evidence need only establish that "the respective products are related in some manner and/or [that] the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369 (Fed. Cir. 2012) (internal citation omitted). The Board assessed the similarities between credit card services (CC Serve's services) and banking and financing services (Apex's services). J.A. 24–28. Because the entry for "credit card services" was deleted from the Trademark ID Manual after CC Serve's registration, the Board first determined the meaning of the identified services. The Board determined that "credit card services" encompasses "issuing credit cards for use to finance purchases as well as counseling regarding credit card debt, processing credit card payments and transactions, credit card authorization, credit card monitoring and alerts, managing credit card accounts, and providing access to credit scores." J.A. 25. The Board determined that because the dictionary definitions for "banking," "bank," and "finance" encompass extending credit or providing funds through the issuance of credit cards, Apex and CC Serve's services are "legally identical, in part." J.A. 27–28. The Board also considered third-party registrations that cover (1) credit card and (2) banking and financing services to support its finding that "the services are of a type that may emanate from a single source under one mark." J.A. 33–34. The Board concluded that because of the high degree of similarity between the parties' services, the second

factor weighed heavily in favor of finding likelihood of confusion. J.A. 35.

On appeal, Apex argues that the parties' services are "not the same and . . . are not directly competitive with each other," especially because CC Serve is partnering with banks to manage credit card programs—"not providing banking services" itself. Appellant's Opening Br. 37. We find Apex's argument unavailing. The Board carefully considered the descriptions of each party's services, and substantial evidence supports the Board's finding that the parties' services are highly similar. We affirm the Board's finding as to the second *DuPont* factor.

B

The sixth *DuPont* factor considers "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 476 F.2d at 1361. "Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005). When a field is crowded with similar marks, the theory is that customers will be more adept at distinguishing marks from each other and are less likely to be confused by similar marks. *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1338 (Fed. Cir. 2015). Evidence that consumers have been educated to distinguish between marks in this way tends to indicate a lack of commercial strength. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015).

Apex submitted several exhibits to the Board that showed third-party uses of marks including the word "Aspire". J.A. 40–46. The marks used the word "Aspire" in connection with credit card-related services and, more broadly, the financial services industry. The Board concluded that because of the overlap between Apex and CC Serve's

services, the properly defined relevant public is "consumers of 'credit card services.'" J.A. 47. The Board focused solely on the marks identified for credit card services and deemed the marks using Aspire for other services to be "essentially irrelevant." J.A. 47. The Board concluded that there were nine Aspire-formative marks for credit card services, but that only nine uses did not rise to the level of "considerable" or "ubiquitous" use found to demonstrate weakness. J.A. 47 (citing *Jack Wolfskin*, 797 F.3d at 1373, 1373 n.2) (discussing "voluminous evidence" of registration and use of paw print design elements at issue and highlighting fourteen "notable examples of third-party registration and use"); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1337 n.1, 1339 (Fed. Cir. 2015) (referring to 26 third-party marks as "a considerable number")). The Board found that "[CC Serve] has not shown that its mark has any particular commercial strength, but [Apex] has not shown that [CC Serve]'s mark is commercially or conceptually weak such that it is entitled to a narrow scope of protection," and determined that CC Serve's mark is entitled to the "normal scope of protection accorded inherently distinctive marks." J.A. 51.

On appeal, Apex contends that the Board erred in limiting the relevant public to consumers of credit card services and that the Board should have considered the 42 other third-party marks that use Aspire and Aspire-formative marks. Appellant's Opening Br. 28. We agree that the Board's analysis was legally flawed. The sixth *DuPont* factor requires the Board to consider similar marks for similar goods and services. In the Board's analysis of the second *DuPont* factor, *see infra* Section III.A, the Board determined that the parties' services are highly similar, which led the Board to conclude that the second factor weighed heavily in favor of finding likelihood of confusion. J.A. 27–28, 33–34. When analyzing the sixth *Dupont* factor, however, the Board restricted the universe of marks it considered to only those relating to credit card services and

excluded marks related to other banking and financing services. That was an error.

We have held that the sixth *DuPont* factor does not require identical goods—only similar ones. *See, e.g., Olde Tyme Foods, Inc. v. Roundy's, Inc.*, 961 F.2d 200, 204 (Fed. Cir. 1992); *Juice Generation, Inc.*, 794 F.3d at 1338. Here, we find the Board's definition of similarity to be too narrow. When the Board has already made a factual finding that the services are highly similar—in fact, partially legally identical—in its analysis of the second *DuPont* factor, J.A. 27–28, the Board should retain the same scope in its consideration of similarity under the other factors. We see no reason to impose a different and more stringent legal standard for similarity under the sixth *DuPont* factor. We thus vacate the Board's finding with respect to the sixth *DuPont* factor and remand for reconsideration of the appropriate scope of third-party marks eligible for consideration in view of the Board's factual finding that the parties' services are highly similar.

C

The first *DuPont* factor considers the "similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. This analysis focuses on the overall commercial impression and whether confusion as to the source of the services offered under the respective marks is likely to result. *In re I.AM.Symbolic, LLC*, 866 F.3d 1315, 1323 (Fed. Cir. 2017). Because commercial impression informs the analysis under the first *DuPont* factor, we must similarly vacate the Board's analysis here because reconsideration of the sixth *DuPont* factor may result in a different determination of the mark's commercial strength or weakness and affect the overall commercial impression. Therefore, we remand for reconsideration of the first factor as well.

IV

We have considered the parties' remaining arguments and find them unpersuasive. We affirm the Board's analysis as to the second *DuPont* factor because the Board did not err in its legal analysis and substantial evidence supports the Board's finding that the parties' services are highly similar. But we vacate the Board's findings with respect to *DuPont* factors six and one and remand for the Board to consider the number and nature of similar marks used on similar goods and the appearance, sound, connotation, and commercial impression of the marks in light of its finding that the parties' services are highly similar.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

COSTS

Costs to appellant.