# United States Court of Appeals for the Federal Circuit

---

**DOLLAR FINANCIAL GROUP, INC.,**
*Appellant*

**v.**

**BRITTEX FINANCIAL, INC.,**
*Appellee*

---

2023-1375

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 92060888.

---

Decided:  March 19, 2025

---

BRYCE J. MAYNARD, Buchanan Ingersoll & Rooney PC, Alexandria, VA, argued for appellant.  Also represented by BASSAM IBRAHIM, LAURA PITTS.

ROBERT L. MCRAE, Gunn, Lee & Cave, PC, San Antonio, TX, argued for appellee.  Also represented by JULIE P. BELL, NICHOLAS ADAM GUINN.

---

Before PROST, TARANTO, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

Dollar Financial Group, Inc. appeals a decision of the Trademark Trial and Appeal Board granting in part and denying in part Brittex Financial, Inc.'s petition for cancellation of two trademark registrations. Because the Board correctly determined that DFG may not rely on the zone of natural expansion doctrine to establish priority and that there was a likelihood of confusion with respect to DFG's recited pawn brokerage and pawn shop services, we affirm.

I

DFG has operated loan financing and check cashing businesses since the 1980s under the name MONEY MART. DFG owns two trademarks for the use of the MONEY MART mark in connection with these businesses and alleges a first use of these marks in 1984.[1] In 2010, DFG began "taking steps" to expand its business offerings "at certain MONEY MART retail stores" to include pawn brokerage and pawn shop services. Appellant's Br. 3. DFG began using the mark in commerce in connection with these services in 2012. J.A. 13.

In 2013, DFG registered two marks, U.S. Registration Nos. 4,524,540 and 4,532,073. *Brittex Fin., Inc. v. Dollar Fin. Grp., Inc.*, Cancellation No. 92060888 (T.T.A.B. Nov. 4, 2022); J.A. 1–2, 63 nn.1–2. These Registrations listed "pawn brokerage and pawn shops" among the covered services. The '540 Registration covers the standard

---

[1]    DFG's two registered trademarks are U.S. Registration No. 3,206,120 ("MONEY MART" mark used in connection with "loan financing") and U.S. Registration No. 2,244,158 ("MONEY MART" mark used in connection with "check cashing and electronic funds transfer services, but not including extensions of credit except to the extent evidenced by a check"). J.A. 3391–92 ('120 Registration) (capitalized in original); J.A. 3450–51 ('158 Registration) (capitalized in original).

characters "MONEY MART," and the '073 Registration covers a design mark featuring the same text. The applications were registered in 2014.

Brittex petitioned to cancel the Registrations on several grounds, including that the Registrations were improperly issued in violation of Lanham Act § 2(d), *see* J.A. 2, 538, which bars registration on the Principal Register of a mark that "so resembles . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). Since the 1990s, Brittex Financial, Inc. or its predecessor in interest, Pawn Management, Inc., (collectively, Brittex) has operated pawn shops throughout Texas under the names "MONEY MART PAWN" and "MONEY MART PAWN & JEWELRY." Brittex has never registered its mark, but it has common law rights in the mark. Brittex argued to the Board that its use of MONEY MART (as part of its longer marks) for pawn brokerage and pawn shop services had priority over DFG's use and that DFG's use of the MONEY MART marks would likely cause confusion.

The Board denied the petition to cancel. *Brittex Fin., Inc. v. Dollar Fin. Grp., Inc.*, Cancellation No. 92060888 (T.T.A.B. Sep. 30, 2020); J.A. 82. The Board concluded that DFG had priority to the MONEY MART mark because it had used the mark in connection with loan financing services since the 1980s, and loan financing services encompasspawn services. J.A. 102–03. Because Brittex did not provide pawn services until 1993, the Board concluded that Brittex failed to establish priority and could not prevail in its cancellation petition.

Brittex appealed, and we reversed the denial of the petition and remanded for further proceedings. *Brittex Fin., Inc. v. Dollar Fin. Grp., Inc.*, Nos. 2021-1370, 2021-1449, 2021 WL 5504880 at *6 (Fed. Cir. Nov. 24, 2021). We

concluded that the Board's reasoning for rejecting Brittex's priority argument was erroneous because "[t]he evidence makes clear that pawn brokerage and pawn shop services integrate two different components, only one of which can be labeled 'loan financing'—the lending, but not the retail sale of collateral." *Id.* at *4. Therefore, to the extent the Board found that pawn services are covered by loan financing services, that finding was unsupported by substantial evidence. We reversed and remanded because "the Board's basis for rejecting Brittex's priority . . . [could not] stand." *Id.*

On remand, the Board held that Brittex had priority because it was "clearly the first to offer pawn brokerage and pawn shop services under [its] mark[]" because Brittex had been using the mark MONEY MART PAWN or MONEY MART PAWN & JEWELRY in connection with pawn services since 1993, while DFG had only used the MONEY MART mark in connection with pawn brokerage and pawn store services since 2012. J.A. 12–13. The Board also concluded that DFG could not rely on the zone of natural expansion doctrine to claim priority because the doctrine is purely defensive. The Board then determined that the relevant *DuPont* factors, which are used to assess the likelihood of confusion between two trademarks, heavily favored a finding of likelihood of confusion because the marks are highly similar and because the "parties' pawn services are overlapping and move through normal trade channels to the same classes of consumers." J.A. 32–33. The Board accordingly partially granted the petition for cancellation and required "[p]awn brokerage and pawn shops" be deleted from Registration Nos. 4,524,540 and 4,532,073. J.A. 41.

DFG appeals the Board's partial grant of the petition for cancellation. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## II

"We review the [B]oard's legal conclusions *de novo*, and its findings of fact for substantial evidence." *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1382 (Fed. Cir. 2006) (quoting *Shen Mfg. Co. v. Ritz Hotel Ltd.*, 393 F.3d 1238, 1240 (Fed. Cir. 2004)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

"The Board's determination of priority is a question of fact reviewed for substantial evidence." *Araujo v. Framboise Holdings Inc.*, 99 F.4th 1377, 1380 (Fed. Cir. 2024). "Likelihood of confusion is a question of law, based on findings of relevant underlying facts, namely findings under the *DuPont* factors"; we review the *DuPont* factors for substantial evidence. *M2 Software*, 450 F.3d at 1381; *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002).

## III

On appeal, DFG asserts that the Board improperly understood our decision in *Brittex* to conclusively resolve the issue of priority. DFG also argues the Board erred in refusing to allow DFG to rely on the zone of natural expansion doctrine or, alternatively, to invoke the doctrine of tacking. DFG further argues that the Board's conclusion that there was a likelihood of confusion between the marks was erroneous. We address each issue in turn.

## A

To make a proper § 2(d) claim, Brittex must show that it has priority in its "MONEY MART PAWN" or "MONEY MART PAWN & JEWELRY" mark for pawn services and that DFG's registered marks are confusingly similar to Brittex's mark. 15 U.S.C. § 1052(d); J.A. 12. "The party who first uses a mark in commerce is said to have priority

over other users." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015).

### 1

DFG argues that the Board erred by overreading our decision in *Brittex* as "holding that Brittex was entitled to priority, rather than merely finding that the Board had erred in relying upon DFG's [prior registration] to establish priority." Appellant's Br. 13. But the Board did not hold that *Brittex* conclusively established that Brittex had priority. The Board instead concluded that Brittex was the first to use the "MONEY MART" mark in connection with pawn services, which is undisputed. The Board then considered and addressed DFG's zone of natural expansion argument, which would not have been necessary if the Board had read *Brittex* as conclusively settling the issue of priority. Therefore, the Board did not err in its application of *Brittex* on remand.

### 2

We next address the zone of natural expansion doctrine. On appeal, DFG argues that it should be able to invoke the zone of natural expansion doctrine to establish priority. Appellant's Br. 15–34.

DFG owns two trademarks for MONEY MART in connection with loan financing and check cashing. Brittex has common law rights in its MONEY MART PAWN and MONEY MART PAWN & JEWELRY marks in connection with pawn shops. DFG sought to register MONEY MART in connection with pawn brokerage and pawn shops, which Brittex petitioned to cancel because of its intervening common law rights. J.A. 1–2. DFG argues that pawn services are a natural zone of expansion from loan financing services, and because DFG had used MONEY MART marks in connection with loan financing services since the 1980s, DFG should have been allowed to rely on the doctrine to

establish priority for pawn brokerage services despite Brittex's intervening common law rights.

Under the doctrine of natural expansion,

> the first user of a mark in connection with particular goods or services possesses superior rights in the mark as against subsequent users of the same or similar mark for any goods or services which purchasers might reasonably expect to emanate from it in the normal expansion of its business under the mark.

*Orange Bang, Inc. v. Ole Mexican Foods, Inc.*, 116 U.S.P.Q.2d 1102, 2015 WL 5675641, at *19 (T.T.A.B. Sept. 10, 2015) (precedential). We considered the applicability of this doctrine in *Jackes-Evans Manufacturing Co. v. Jaybee Manufacturing Corp.*, 481 F.2d 1342, 1345 (C.C.P.A. 1973). There, we held "that the 'expansion of business' doctrine is purely a defensive doctrine." *Id.* We then explained the policy underlying the defensive use of the doctrine. If a consumer is familiar with a user's mark that has been established on a particular line of goods (i.e., the senior user with regard to that line of goods), and that consumer sees a similar mark on a logically related line of goods from another user (i.e., the junior user with regard to the original line of goods), the consumer might naturally attribute the junior user's goods to the senior user because the logically related goods would seem to be a natural "zone of expansion" for the senior user's goods. Defensive use of the doctrine would allow the senior user to prevent the junior user's registration of a similar mark on logically related goods. *Id.* But the doctrine does not give the senior user offensive use, which would be the "right to register [a] mark on an expanded line of goods where the use of the mark covered by such registration would lead to a likelihood of confusion, mistake or deception." *Id.* The zone of natural expansion thus only allows a senior user to prevent junior users from registering similar marks on related lines of

goods but does not confer the senior user a proactive right to register a mark.

The Board has previously relied on the proposition that an earlier registration does not establish priority for a later application when the goods or services are different. *See, e.g., Am. Hygienic Lab'ys., Inc. v. Tiffany & Co.*, 12 U.S.P.Q.2d 1979, 1989 WL 274397, at \*5 (T.T.A.B. Sept. 28, 1989) ("While applicant has rights in the mark TIFFANY for a wide variety of items such as jewelry, silver, china, etc., the question in this proceeding is which party has prior rights as a result of use of the mark in connection with cosmetics and toiletry products. That is to say, while there is no doubt that applicant has priority of use of its marks on a wide array of products (jewelry, crystal, china, etc.), we do not believe that this use may be relied on to establish priority with respect to the specific cosmetic and toiletry products in its application."). We agree. The zone of natural expansion cannot be used to establish priority in different goods or services, especially when such use could conflict with the prior use of another. We decline to expand the scope of the zone of natural expansion doctrine and affirm that the doctrine may only be used defensively to prevent junior users from registering similar marks on goods in a senior user's zone of natural expansion.

Under this precedent, DFG cannot use the zone of natural expansion doctrine offensively to defeat Brittex's intervening rights. DFG could have properly invoked the zone of natural expansion in a defensive manner had Brittex attempted to register its MONEY MART mark in connection with pawn services in the 1990s and DFG opposed that registration. In that scenario, DFG could assert the doctrine defensively to protect its right to expand into pawn services and prevent consumers from assuming that Brittex's pawn services were associated with any of DFG's existing services, if subsequent analysis supported finding that pawn services are a natural expansion of business for

loan financing. But the doctrine may not be used offensively to establish priority in the manner DFG suggests because that would essentially grant DFG the right to register its mark on a line of expanded goods, even though it would likely cause confusion with Brittex's established common law rights.

Because we conclude that DFG cannot rely upon the zone of natural expansion in an offensive manner to establish priority, we need not decide whether loan financing and pawn shop services are sufficiently similar or whether a supplier of loan financing would naturally expand into pawn shop services.

3

We next turn to DFG's argument that the Board should have alternatively analyzed the doctrine of tacking after the Board concluded the zone of natural expansion doctrine was not available to DFG. The doctrine of tacking allows a trademark user to make "certain modifications" to its mark and still rely on "the priority position of an older mark." *Bertini v. Apple Inc.*, 63 F.4th 1373, 1377 (Fed. Cir. 2023). We allow tacking because otherwise "a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999). Tacking is applicable where the two marks "'create the same, continuing commercial impression' so that consumers 'consider both as the same mark[,]'" *Bertini*, 63 F.4th at 1377 (quoting *Hana Fin.*, 574 U.S. at 422), and where the "new and old goods or services [are] 'substantially identical.'" *Id.* at 1380–81. "Goods and services are substantially identical for purposes of tacking where the new goods or services are within the normal evolution

10    DOLLAR FINANCIAL GROUP, INC. v. BRITTEX FINANCIAL, INC.

of the previous line of goods or services," but they need not be completely identical. *Id.* at 1381.

DFG argues that the Board should have considered the doctrine of tacking when analyzing DFG's priority claim. But DFG did not make a tacking argument before the Board and instead raised the argument for the first time on appeal. DFG argues that it impliedly asserted a tacking defense when it argued that pawn and loan financing services were "substantially identical" in its trial brief. Appellant's Reply Br. 13–14. But the language DFG refers to was quoting a prior ruling of the Board and did not invoke tacking. *See* J.A. 5860. As a result, the Board never considered tacking because DFG neither briefed nor clearly pled this argument during the cancellation proceeding. We therefore conclude that DFG's tacking argument is forfeited because it was raised for the first time on appeal. *See Hylete LLC v. Hybrid Athletics, LLC*, 931 F.3d 1170, 1174 (Fed. Cir. 2019) ("Generally, federal appellate courts do not consider issues 'not passed upon below' or entertain arguments not presented to the lower tribunal." (quoting *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008))).

B

DFG argues that the Board's finding of likelihood of confusion was erroneous. Likelihood of confusion is analyzed using the multi-factor test set forth in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973). The Board need not consider every *DuPont* factor, only those "that are relevant and of record." *M2 Software*, 450 F.3d at 1382. The parties dispute only five of the *DuPont* factors. They are:

(1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. . . .

(5) The fame of the prior mark (sales, advertising, length of use). . . .

(9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark). . . .

(11) The extent to which applicant has a right to exclude others from use of its mark on its goods. . . .

(13) Any other established fact probative of the effect of use.

*DuPont*, 476 F.2d at 1361.

1

First, we address the fame or strength of Brittex's mark. The fifth *DuPont* factor considers "[t]he fame of the prior mark (sales, advertising, length of use)." *Id.* "In a likelihood of confusion analysis, the fame or strength of a mark is not a binary factor, but rather varies along a spectrum from very strong to very weak." *Bureau Nat'l Interprofessionnel du Cognac v. Cologne & Cognac Ent.*, 110 F.4th 1356, 1366 (Fed. Cir. 2024) (citing *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017)). "Marks are often classified in categories of generally increasing distinctiveness . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

The Board concluded that Brittex's "MONEY MART" mark was suggestive of pawn services and that use of the mark with "PAWN" or "PAWN & JEWELRY" did not detract from the mark's suggestiveness. J.A. 24. But the Board agreed with DFG that the mark was not "particularly strong, commercially." J.A. 25. The Board thus found that "MONEY MART possesses a slightly stronger than average degree of commercial strength" and concluded that this factor was neutral in the analysis. J.A. 26.

DFG argues that the Board's analysis on this factor was flawed and contends that the Board erroneously evaluated the strength of Brittex's mark "on a binary scale, where suggestive, fanciful, and arbitrary marks are all equally 'strong,' and only descriptive marks are 'weak.'" Appellant's Br. 46. We do not read the Board's analysis as evaluating strength on a binary scale, as DFG suggests, but instead clarifying that suggestive marks are not inherently "weak." *See* J.A. 25 (quoting *In re Great Lakes Canning, Inc.*, 227 U.S.P.Q. 483, 1985 WL 71929, at *3 (T.T.A.B. June 28, 1985) ("[T]he fact that a mark may be somewhat suggestive does not mean that it is a 'weak' mark entitled to a limited scope of protection.")). Further, substantial evidence supports the Board's conclusion that, conceptually, MONEY MART is suggestive of pawn services and that Brittex's evidence of advertising or the mere fact that it had used its mark for 27 years were not sufficient to increase the commercial strength of the mark. J.A. 24–26.

2

We next address the similarity of the marks. The first *DuPont* factor considers "[t]he similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361.

The Board found that DFG's "MONEY MART word and MONEY MART word and design marks are highly similar to [Brittex's] MONEY MART marks in appearance, sound, connotation and commercial impression." J.A. 22. Although Brittex uses "MONEY MART PAWN" or "MONEY MART PAWN & JEWELRY" for its stores, the Board concluded that "pawn" and "jewelry" did not "add[] any source-identifying significance" and were thus entitled to less weight in the analysis. J.A. 21. The Board concluded that this factor weighed heavily in favor of likelihood of confusion. J.A. 22.

DFG argues that the Board failed to give adequate weight to the inclusion of the terms "pawn" and "jewelry" in Brittex's mark. DFG argues that the Board's errors in analyzing the strength of Brittex's mark colored this analysis because while the addition or deletion of descriptive terms may not be enough to distinguish commercially strong marks, it can be sufficient when the marks are commercially weak. We find no legal error in the Board's analysis. We also agree with the Board's finding that Brittex's mark has greater commercial strength than average, so the addition of descriptive or generic terms is not enough to dilute the dominant portion of Brittex's marks. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) ("That a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark."). Further, substantial evidence supports the Board's conclusion that DFG's marks are highly similar to Brittex's marks in appearance, sound, connotation, and commercial impression.

3

Third, we turn to the ninth *DuPont* factor, which considers "[t]he variety of goods on which a mark is or is not used." *DuPont*, 476 F.2d at 1361. "If a party in the position of plaintiff uses its mark on a wide variety of goods, then purchasers are more likely to view a defendant's related good under a similar mark as an extension of the plaintiff's line." *DeVivo v. Ortiz*, 2020 U.S.P.Q.2d 10153, 2020 WL 1227592, at *16 (T.T.A.B. 2020) (precedential). The Board rejected DFG's argument on this factor, concluding that this factor is purely defensive and can be used "only to prevent registration or use of a mark." J.A 28. The Board found that, as a result, this factor was neutral.

On appeal, DFG argues that the Board committed legal error by concluding that this was a purely defensive factor. DFG also argues the Board failed to adequately consider

14    DOLLAR FINANCIAL GROUP, INC. v. BRITTEX FINANCIAL, INC.

the variety of services for which DFG's marks are used, including "money transfer services, money exchange services, short-term consumer loans, debit card services, and gift card services." Appellant's Br. 50.

The Board did not err in its analysis. The Board cited *DeVivo*, which states the rationale behind the consideration of this factor: "[i]f a party in the position of plaintiff uses its mark on a wide variety of goods [or services], then purchasers are more likely to view a defendant's related good[s] [or services] under a similar mark as an extension of the plaintiff's line." 2020 WL 1227592, at *16. Thus, the correct comparison is whether Brittex's use of the mark would lead consumers to believe that DFG's later use was associated with Brittex—which is the comparison the Board made. We see no error in the Board's conclusion that this factor was neutral in the overall analysis.

4

Fourth, we turn to DFG's right to exclude. The eleventh *DuPont* factor considers "[t]he extent to which applicant has a right to exclude others from use of its mark on its goods." *DuPont*, 476 F.2d at 1361. The Board concluded that DFG did not have a right to exclude because Brittex "began using its MONEY MART PAWN or MONEY MART PAWN & JEWELRY mark in 1993 and developed valuable intervening rights in this use of its marks for pawn services well before [DFG] commenced use of its mark on those services in 2012." J.A. 30–31. The Board ultimately concluded that this factor was neutral in its analysis.

On appeal, DFG argues the Board failed to consider this factor. Appellant's Br. 51–52. We find DFG's argument unavailing. The Board did consider DFG's potential right to exclude and concluded that this factor was neutral due to Brittex's intervening rights. We find no error in the Board's analysis of this factor.

5

Finally, we address the thirteenth *DuPont* factor, which considers "[a]ny other established fact probative of the effect of use." *DuPont*, 476 F.2d at 1361. Before the Board, Brittex argued that the Board should find that DFG acted with bad faith because Brittex had sent DFG multiple cease-and-desist letters, so DFG was aware of Brittex when filing its trademark applications. The Board concluded that this argument was unavailing because "mere knowledge of a prior similar mark" is not sufficient to warrant a bad-faith inference. J.A. 32. The Board concluded that this factor was neutral in its analysis. J.A. 32.

On appeal, DFG argues that the Board failed to consider that DFG owns "two incontestable registrations for the identical mark MONEY MART in connection with virtually identical, or at least extremely closely related services." Appellant's Br. 52. DFG relies on *In re Strategic Partners, Inc.*, where the Board, in considering the thirteenth *DuPont* factor, held that an applicant's earlier uncontestable registration for goods that included footwear meant that its later applied-for registration with a "substantially similar" mark and "identical goods," which also included footwear, would not be confused with a previously registered mark. 102 U.S.P.Q.2d 1397, 2012 WL 1267930 at *1, *3–4 (T.T.A.B. March 28, 2012) (precedential). But the present case is factually distinguishable. There, both registrations included footwear, but here, DFG's prior registrations make no mention of pawn shops or pawn services. The Board did not err in failing to consider the earlier registrations for different services because there are not common goods or services between DFG's prior registrations and the registration at issue. Further, the Board considered the impact of the prior registrations throughout its analysis. *See* J.A. 27–31. Therefore, we do not find legal error in the Board's analysis under the thirteenth factor.

16    DOLLAR FINANCIAL GROUP, INC. v. BRITTEX FINANCIAL, INC.

## IV

We have considered DFG's remaining arguments and find them unpersuasive. Because the Board did not err with respect to its priority analysis and because substantial evidence supports the Board's determinations for each disputed *DuPont* factor, we affirm.

**AFFIRMED**